## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **8:23CR214** |
| **Plaintiff,** | |
| **vs.** | **FINDINGS AND** |
| | **RECOMMENDATION** |
| **MICHELLE LEE MARR,** | |
| **Defendant.** | |

This matter comes before the Court on the Motion to Suppress Statements and Evidence (Filing No. 31) filed by Defendant, Michelle Lee Marr. Defendant filed a brief (Filing No. 32) in support of the motion and the Government filed a brief in opposition (Filing No. 39).

The Court held a pre-hearing status conference with counsel on May 6, 2024, and held an evidentiary hearing on the motion on August 29, 2024. Defendant was present at the evidentiary hearing proceedings with her attorney, Assistant Federal Public Defender, Kelly M. Steenbock. The Government was represented by Assistant United States Attorney, Lecia E. Wright. The Court received into evidence, without objection, the Government's exhibits 1-4 and Defendant's exhibits 101-103. Matthew J. Benson, who at the time of the underlying events was a police officer for the Winnebago Tribal Police ("Officer Benson"), and Joel Feekes, a special agent with the Federal Bureau of Investigation ("Agent Feekes"), testified at the hearing. A transcript (TR.) of the hearing was prepared and filed on September 12, 2024. (Filing No. 51). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge will recommend that the motion be denied.

## BACKGROUND

On March 12, 2022, Officer Benson[1] was called by emergency medical services (EMS) for lift assistance at a residence in Winnebago. (TR. 14-15). Defendant had called for an ambulance when she could not wake her partner, Jesse Gilpin ("Mr. Gilpin"), around noon that day. When Officer Benson arrived, Mr. Gilpin was unconscious and laying in bed, and EMS personnel were

---

[1] Officer Benson attended police academy in Grand Island, Nebraska in 2010, then worked at the casino in Winnebago from 2011-2015 before transferring to the tribal police department in 2015. At the time of the underlying events, he was a patrol officer and K-9 handler for the Winnebago Police Department. Officer Benson is currently the director of the domestic violence program in Winnebago. (TR. 12-13).

preparing a gurney to move him to an ambulance. (TR. 15). Officer Benson, who was somewhat familiar with Mr. Gilpin, testified he did not observe anything unusual about the house or Mr. Gilpin. (TR. 16, 22-23). Mr. Gilpin was transferred to a hospital for treatment, but passed away the following day on March 13, 2022. A subsequent autopsy determined Mr. Gilpin's death was caused by a brain injury. (TR. 38).

Agent Feekes[2] first became involved with the investigation on March 12, 2022, prior to Mr. Gilpin's passing. (TR. 36-38). At approximately 10:15 a.m. the following day, March 13, 2022, Officer Benson and Agent Feekes went to Defendant's mother's home in Winnebago to interview Defendant about what had happened to Mr. Gilpin. Defendant and her mother talked to the officers together.[3] (TR. 16-17, 23, 36-37). Officer Benson was dressed in full uniform with his sidearm visible. (TR. 18). Agent Feekes was wearing plain clothes and his firearm was not visible. (TR. 37). Agent Feekes and Officer Benson did not provide Defendant with *Miranda* warnings because as they both testified, Defendant was not in custody; they had no intention of arresting her; and they considered this to only be an informational interview. (TR. 18, 38, 55). Officer Benson testified that they were "just looking for information of what might have happened," and at the time, "the idea of domestic homicide was not necessarily on the radar." (TR. 24-25).

The audio file and transcript of this first interview reflects that officers began their questioning by asking biographical information about Defendant and Mr. Gilpin, and about what happened the night before and the morning she found Mr. Gilpin unresponsive. Defendant stated she "passed out" around 5:00 or 5:30 p.m. on Friday, but that her daughter saw Mr. Gilpin getting into the shower around 7:00 p.m. (Ex. 101 at pp. 5-6, 27-28). During this interview, Agent Feekes asked Defendant if she put makeup on Mr. Gilpin and she replied, "Yeah," and explained Mr. Gilpin had asked her to cover a bruise on the side of his face. (Ex. 101 at pp. 14-16). Defendant mentioned she saw on her phone that Mr. Gilpin had called a friend between 8 and 8:30 p.m., which were both missed, and said, "Maybe something happened." (Ex. 101 at p. 20). Defendant explained that she and Mr. Gilpin shared a cell phone, which she had with her. Agent Feekes asked

---

[2] Agent Feekes is a special agent in the FBI assigned to the Sioux City Resident Agency out of the Omaha Field Office. He is currently assigned to work with Indian country crimes, including those that take place in the Winnebago Reservation. (TR. 34). Agent Feekes attended FBI Academy in Quantico, Virginia, in 2007, and has since had hundreds of hours of on-the-job and virtual training over the last 16 years. (TR. 35).

[3] The audio recording of Defendant's first interview is contained in Exhibit 1, and Exhibit 101 is a transcript of the interview.

to see the phone, wrote down this friend's number, and gave the phone back to Defendant. (Ex. 101 at pp. 21-22).

Agent Feekes and Defendant discussed what useful information might be on the phone, including outbound and inbound calls. (TR. 29-30, 39; Ex. 101 at pp. 22-26). Agent Feekes continued to ask Defendant about bruising on Mr. Gilpin, makeup, and about what she thought happened. Agent Feekes also asked if Defendant had ever punched Mr. Gilpin and whether the bruise was one she covered up with makeup. Defendant denied hitting Mr. Gilpin and stated the bruise she covered with makeup was not from her. (Ex. 101 at pp. 26-38). Agent Feekes began wrapping up the interview, telling Defendant not to leave town because "we'll need to talk to you again," and stated, "we might need that phone." (Ex. 101 at pp. 41-43). Agent Feekes advised Defendant "we have a lot of tools" to look through phones, and "recommend[ed]" she not try to erase or "do anything weird" with the phone because "we'll be able to see everything that was on there anyway." (Ex. 101 at p. 43). Agent Feekes again began wrapping up the interview, stating he would give Defendant his phone number, and stated that once he gets the autopsy results back "we'll be in touch again." (Ex. 101 at p. 46).

Defendant's mother began speaking about how Mr. Gilpin's sisters were saying negative things about Defendant on social media; Agent Feekes says the autopsy will let them know "for sure" what happened, and Defendant responds, "Yeah, I would really like to know . . . 'cause everybody keeps asking me and I don't know nothing. I don't know what he did." (Ex. 101 at pp. 47-50). Defendant's mother then asked, "How long would you take the -- take her phone?" Agent Feekes replied, "It depends. And we'll – we'll see if we need it, you know. But we might – I could ask for it now. I don't know if – you know, I mean, sometimes we just ask for consent to take it." (Ex. 101 at p. 51). Defendant told Agent Feekes she shares a phone with Mr. Gilpin, who did not have his own phone, and Defendant does not have a home phone. Agent Feekes replied, "So we'll cross that bridge when we need to because that can take a little while. We would just look at call records and anything like that to see if there's any evidence on there of him meeting with somebody. Are there any pictures on there from –" at which point Defendant interrupted and said, no, Mr. Gilpin "doesn't take pictures." Agent Feekes continues, "But then we would – we would look through it and we can also go through the service providers with legal process, so we can see . . . who he – if anybody called him. Anybody else called him or he called anybody else or texted anybody's cell phone." (Ex. 101 at p. 51-52). Agent Feekes testified he wanted to look at

3

Defendant's phone because she had indicated she shared it with Mr. Gilpin, and it was the only phone he used. Defendant mentioned she had "passed out" the night before his death around 5:30 p.m., and claimed she did not know where Mr. Gilpin went or what had happened to him, so Agent Feekes wanted to see if there was any evidence on the phone that might help officers learn if Mr. Gilpin placed or received any phone calls, or to find out more about what he did the night before. (TR. 39).

Agent Feekes asked if there was another way to reach Defendant "if we take that phone," and Defendant provided her mother's phone number. (Ex. 101 at pp. 52-53; TR. 40). Agent Feekes then asked, "Well, would you feel comfortable giving us that phone now?" and Defendant replied, "mm-hmm, Okay, yeah, take it." (Ex. 101 at p. 53; TR. 39). Agent Feekes continued, "I don't want you to be without a phone forever, but we can try to look at it and see what we need to do," to which Defendant stated, "Okay," and replied, "Yeah," when Agent Feekes followed up with, "If that's alright?" (Ex. 101 at p. 53; TR. 39, 55-56). Agent Feekes did not advise Defendant that she either did or did not have to give him her phone or that she had a right to refuse consent. (TR. 55, 59, 75). Agent Feekes asked Defendant for the phone's password, which she provided. Defendant also provided her phone charger. Agent Feekes then ended the interview, asking Defendant to contact him if she thinks of anything else she wants to tell them. (Ex. 101 at pp. 53-64). The total length of this first interview was just over 51 minutes. (Ex. 1). Although officers took Defendant's phone on this occasion, they did not execute a search of the phone at this time. (TR. 27).

After the autopsy verified that Mr. Gilpin's death was homicide, Agent Feekes conducted a second interview with Defendant at her mother's house shortly after 10 a.m. on March 17, 2022.[4] Defendant was there with several of her children. (TR. 41). Agent Feekes was again wearing plain clothes and did not have his firearm visible. He was accompanied on this date by Special Agent Paul Voss and Officer Briggs with Thurston County Sheriff's Office. (TR. 41). At the outset of this conversation, Agent Feekes asked Defendant if she remembered how she gave them her phone the other day, and said there was "just some admin for that." (Ex. 102 at pp. 3-4). Agent Feekes asked for Defendant's consent to search her residence, and stated that he had additional paperwork related to the phone. (TR. 41). Specifically, Agent Feekes presented Defendant with an FD-26, which is a consent to search form, and an FD-597, which is a receipt for property form that he had

---

[4] The audio recording of this interview is contained in Exhibit 2 and Exhibit 102 is a transcript of this audio. (TR. 40-41).

completed for taking her phone.[5]   Agent Feekes testified he provided Defendant with an opportunity to review the paperwork, saying, "This just saying, kind of what we talked about; your consent for us to look. So, it has a date and then your signature." (TR. 43, 75; Ex. 102 at pp. 5-6). Agent Feekes did not verbally tell Defendant of her right to refuse consent, although the form stated, "I have been advised of my right to refuse consent." (TR. 60; Ex. 3).  Agent Feekes testified that law enforcement did nothing with Defendant's phone between when they took it on March 13, 2022, until a forensic examination took place on March 28, 2022.  (TR. 44).

Agent Feekes informed Defendant they had the results of the autopsy showing Mr. Gilpin died of blunt force injuries. He continued, "So we definitely want to figure out what exactly happened to him. And I know that's your goal, too. So I think it would be helpful today just to, you know, while we're here, we can look around your house, if that's okay."  Defendant replied, "Okay."  Agent Feekes continued that they would "see if anything looks suspicious or even to you also, if something seems out of place," and again asked for consent to search; Defendant replied, "Yeah." (Ex. 102 at pp. 4-7).  Agent Feekes also asked if Defendant still had the makeup she put on Mr. Gilpin, which she had mentioned in the prior interview; Defendant replied it was in the hall closet.  (TR. 60; Ex. 102 at pp. 8-10).  Agent Feekes continued to ask Defendant about the makeup and bruises and her recollection of the timing of events. This second interview concluded after approximately 19 minutes.  (Ex. 2).

At approximately 12:30 p.m. on May 18, 2022, Agent Feekes and Agent Voss sought a third interview with Defendant, this time at her residence.[6]  (TR. 44-45).  Neither agent wore their uniforms or were visibly armed.  (TR. 45).  Agent Feekes testified he wanted to speak to Defendant again for three reasons.  First, he wanted to provide her with an update on the autopsy findings of Mr. Gilpin's death, which was ruled a homicide due to blunt force trauma.  He also wanted to re-question Defendant about some of inconsistencies or discrepancies that officers found during their investigation and other interviews, and to ask her if she wanted to clarify or make new statements in light of that.  Finally, he wanted to ask Defendant if she would be willing to take a polygraph. (TR. 45).  Agent Feekes testified he had learned there was a history of assault and physical abuse by Defendant against Mr. Gilpin, and that the autopsy determined Mr. Gilpin died of blunt force trauma inconsistent with a fall.  Agent Feekes describes the first two conversations with Defendant

---

[5] The signed consent form was received as Exhibit 3.

[6] The audio recording of this interview is contained in Exhibit 4, and Exhibit 103 is a transcript of this audio.

as "cooperative" and "conversational," and that she was "always willing to talk." (TR. 49). Agent Feekes acknowledged that this third interview was "more of an interrogation" and more confrontational, particularly with respect to inconsistencies between her statements and other individuals' statements, but overall the tone of the conversation was relatively calm, as "[n]obody had raised their voices[.]" (TR. 46-48).

At the beginning of the third interview, the agents made small talk with Defendant about camping before thanking her for meeting with them and stating, "You know, this is voluntary. Like, you don't have to talk to us. And obviously you are not in any custody with us, but just wanted to give you, kind of, an update where we're at. And because I've got some calls from various people, including the medical examiner." (Ex. 103 at pp. 1-4). Agent Feekes testified he was "more confrontational" about Mr. Gilpin's injuries, the autopsy, her prior statements regarding the timeline of what she and Mr. Gilpin did, her use of makeup, and her prior assaults of Mr. Gilpin. Agent Feekes stated this "will probably go to trial," and Defendant needs to "think about what a jury's going to see," including her past assaults and the evidence of Mr. Gilpin's injuries, which is "going to make you look very guilty." Defendant generally maintained that she already told them that she "passed out" around 5 or 5:30 the night before, denied harming Mr. Gilpin, and repeated that she does not know what happened to him. (TR. 64-65; Ex. 103 at pp. 22-23). Towards the end of the interview, Defendant asked how soon she could get her phone back because she needs it for work. Agent Feekes replied he would "look into that." (Ex. 103 at p. 56-57). Agent Feekes testified she did not demand her phone back. (TR. 48). Agent Feekes concluded this third interview after approximately 48 minutes. (Ex. 4). Defendant was not arrested following any of these interviews.

Agent Feekes testified he spoke to Defendant a fourth time, on July 27, 2022, at her residence, but did not record this interaction. Agent Feekes testified he had gone to her residence to re-interview Defendant's children, and briefly spoke to Defendant outside her home. (TR. 51). Agent Feekes testified he "went over some of the same questions to see if she had . . . anything to add, but it was very short," and did not record this conversation since it was "kind of an unintended interview," as he was there to talk to the children. (TR. 51-52).

Defendant was not charged until over a year later when, on October 17, 2023, the Grand Jury returned an Indictment charging Defendant with Mr. Gilpin's murder within the exterior boundaries of the Winnebago Indian Reservation, in violation of 18 U.S.C. §§ 1111 and 1153, and

6

tampering with evidence by attempting to conceal bruising to Mr. Gilpin's face, in violation of 18 U.S.C. § 1512(c)(1).  (Filing No. 1).

Defendant has filed the instant motion to suppress evidence obtained from the seizure and subsequent search of her cell phone as violative of her Fourth Amendment rights.  (Filing No. 31). Defendant argues she was not advised of her right to refuse consent and that she surrendered her phone to law enforcement "after succumbing to law enforcement authority."  Defendant therefore argues her consent—both to the seizure of her phone during the first interview, and her consent for them to search the phone given during her second interview—was involuntary and invalid.  (Filing No. 32 at p. 4).

Defendant also moves to suppress any inculpatory statements she made in response to law-enforcement interrogation as violative of her Fifth Amendment rights.  (Filing No. 31 at p. 1). Defendant contends the "totality of the circumstances of the interrogation, and the failure of law enforcement to warn [her] of her [*Miranda*] rights, render her statements involuntary."  (Filing No. 31 at p. 2).  Defendant argues that each interview became increasingly confrontational, and that certainly by the third interview *Miranda* warnings were required because "Notwithstanding the fact that the final interrogation occurred at [Defendant's] home and the FBI told her she was not in 'their' custody, a reasonable person would not have felt at liberty to terminate the interview and refuse to incriminate themselves."  (Filing No. 32 at p. 6).

The Government contends that the search of Defendant's phone was conducted pursuant to her valid and voluntary consent, after she voluntarily provided her phone to law enforcement during the first non-custodial interview.  (Filing No. 39 at pp. 4).  The Government further contends Defendant's statements to law enforcement on all three occasions were voluntary, and that she was not in custody at any point when she made the statements so *Miranda* warnings were not required. (Filing No. 39 at p. 7).

## ANALYSIS

### I.    Defendant's Statements

#### a.  Whether Miranda warnings were required

Defendant argues her statements to law enforcement during each interview were involuntary because she was unexpectedly questioned by law enforcement on three occasions at her or her mother's home, and that each interaction contained "increasing levels of confrontation."

7

Defendant contends that, certainly by the third interview, officers were required to provide her with a *Miranda* rights advisory, suggesting "the only purpose to withhold warnings would be to obfuscate [Defendant's] sense of choice in the matter." Defendant contends the interview was "completely police dominated," "aggressive" and the fact that Defendant was not arrested at the conclusion "was a huge surprise to her." (TR. 80-81).

"The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody." *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021) (quoting *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017)); see also *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). It is undisputed that Defendant was not provided with a *Miranda* rights advisement prior to any of the three interviews at issue. And, although neither the Government nor Defendant specifically address whether Defendant was "interrogated," the undersigned magistrate judge concludes she was, because during each of the three interviews law enforcement agents asked her a number of questions about Mr. Gilpin's injuries, her actions, and the circumstances surrounding his death they "should know [we]re reasonably likely to elicit an incriminating response" from Defendant. See *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" as "express questioning or its functional equivalent," which includes "words or action on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."). The parties do dispute whether Defendant was "in custody" during any of the three interviews, and whether *Miranda* warnings were therefore required prior to her questioning on any occasion.

The Eighth Circuit has set forth several non-exclusive factors that courts can consider in deciding whether a suspect is "in custody" for the purposes of *Miranda*, including:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Hoeffener*, 950 F.3d 1037, 1045-46 (8th Cir. 2020) (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which,

if present, mitigate against the existence of custody at the time of questioning.  Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *United States v. Axsom*, 289 F.3d 496, 500-01 (8th Cir. 2002).  None of the six factors are entirely dispositive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" *United States v. Sanchez*, 676 F.3d 627, 630-31 (8th Cir. 2012) (quoting *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011)).

Because the ultimate custody determination is based on the totality of the circumstances, "a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors." *Griffin*, 922 F.2d at 1349.  The key inquiry is "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994).  "In answering this question, [the court] look[s] at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting *Stansbury*, 511 U.S. at 322-23).

In reviewing the factors as applied to each of the three recorded interviews with Defendant, the undersigned magistrate judge finds that Defendant was not "in custody" for purposes of *Miranda* on any occasion.  First, Defendant was neither formally arrested nor faced restraints on her freedom of movement remotely close to a degree associated with a formal arrest at any point— Defendant was never handcuffed, placed in a squad car, or otherwise restrained or physically manipulated by law enforcement.  See *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) ("A suspect will generally feel more able to end an interview when his mobility is unimpeded by the authorities.").  Defendant was also not arrested following any of the interviews; her third interview took place in May 2022, and the Indictment in this matter was not returned until October 2023–nearly one and a half years later.  See *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) ("Lack of arrest is a 'very important' factor weighing against custody.").

Additionally, all three interviews took place either at Defendant's mother's home or her own home.  "When a person is questioned 'on his own turf,' [the Eighth Circuit] ha[s] observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *United States v. Czichray*, 378 F.3d 822, 826

(8th Cir. 2004) (quoting *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984) and *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985)).

Each interview took place after agents came to Defendant or her mother's home in the late morning or early afternoon. Prior to the first interview, law enforcement did not have the autopsy results, and at the outset of the interview they made it clear that they were just looking to see if Defendant could provide information about what had happened since she had been the one to call the ambulance for Mr. Gilpin when she found him unresponsive. As Officer Benson testified, "the idea of domestic homicide was not necessarily on the radar." Defendant appeared willing to talk. In the first interview, without prompting, Defendant volunteered her phone to Agent Feekes to show him two phone calls that she indicated could show Mr. Gilpin may have gone out after she passed out, and that "[m]aybe something happened." The agents did not threaten, coerce, or deceive Defendant to get her to talk. Instead, Defendant expressed to officers she also "would really like to know" what happened to Mr. Gilpin. See, e.g., *United States v. Giboney*, 863 F.3d 1022, 1028 (8th Cir. 2017); *United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011); *United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016) ("The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart.").

Overall, the tone of the interviews was conversational, although by the third interview Agent Feekes admittedly became "more confrontational" regarding inconsistencies in Defendant's statements and what his investigation had uncovered so far. See, e.g., *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (concluding a "friendly and cooperative" interview in the familiarity of the defendant's own home weighed against custody). Importantly, prior to this "more confrontational" third interview, Agent Feekes explicitly advised Defendant that "this is voluntary. . . you don't have to talk to us. And obviously you are not in any custody with us[.]" Agent Feekes' advisement strongly weighs against a finding that Defendant was in custody. "The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020) (quoting *Griffin*, 922 F.2d at 1349). "This is 'powerful evidence that a reasonable person would have understood that [s]he was free to terminate the interview.'" *Id.* (quoting *Czichray*, 378 F.3d at 826).

10

Two law enforcement officers were present at the first and third interviews, and three were present at the second, although the interviews were largely conducted by Agent Feekes. Agent Feekes testified he wore plain clothes with no firearm visible for each interview, while the other officers wore uniforms with their firearms holstered. None of the interviews lasted more than one hour; the first interview was the longest at just over 51 minutes. Thus, the circumstances do not support a finding that the interviews were "police dominated." *Griffin*, 922 F.2d at 1352 (requiring court to consider "the entire context of the questioning, including such considerations as place and length of the interrogation" when determining whether the interview was police dominated); see, e.g. *Czichray*, 378 F.3d at 825, 830 (concluding a nearly seven hour interview where agents arrived at the defendant's home at 6:30 a.m., demanded he answer the door, told the defendant to call in sick to work, and said they would "'light up [the defendant's] world'" if he did not cooperate was not custodial); *United States v. Leon*, No. 8:19CR248, 2020 WL 2079261, at *4 (D. Neb. Apr. 30, 2020) (overruling the undersigned magistrate judge and finding the totality of the circumstances did not support a finding the defendant was in custody for purposes of *Miranda* when two FBI agents initiated contact with the defendant by a surprise visit to his home at noon, despite not informing the defendant he was not under arrest and could refuse to talk).

After carefully considering the totality of the circumstances surrounding each of Defendant's three interviews, the undersigned magistrate judge finds they were not custodial. Accordingly, law enforcement officers were not required to provide a *Miranda* rights advisory. See *Giboney*, 863 F.3d at 1029.

### b.  *Whether Defendant's statements were voluntary*

Even if *Miranda* warnings were not required, a suspect's statements still must be voluntary to be admissible. Defendant asserts that the totality of the circumstances of the interviews, including the failure to provide *Miranda* warnings, rendered her statements involuntary. (Filing No. 32 at pp. 5-6).

"A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020). The central question in evaluating voluntariness "is whether the defendant's will was overborne." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); see

also *United States v. Sandell*, 27 F.4th 625, 630 (8th Cir. 2022). To answer that question, the court examines "both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure," *United States v. Monteer*, 83 F.4th 1119, 1123 (8th Cir. 2023) (quoting *Sandell*, 27 F.4th at 630), which requires "examining the totality of the circumstances." *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005)). "[T]he degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition" are all relevant factors. *Magallon*, 984 F.3d at 1284 (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Magallon*, 984 F.3d at 1284 (quoting *LeBrun*, 363 F.3d at 724). "The government must prove by a preponderance of the evidence that the defendant's statements were voluntary." *Brave Heart*, 397 F.3d at 1040.

For many of the same reasons discussed above, the undersigned magistrate judge finds that the totality of circumstances demonstrates that Defendant's will was not overborne at any time she made statements during the three interviews. Each interview was less than one hour and separated by several days (between the first and second) or months (between the second and third); Defendant was not physically restrained or otherwise formally arrested at any point before or after the interviews; Defendant was questioned at her home or her mother's home, and her mother was present and participated in the first interview. Officers never implied Defendant was required to speak to them, and prior to the third interview explicitly informed her it was "voluntary" and she did "not have to talk" to them; and no more than three officers were present for any of the three interviews. The interviews were generally conversational; law enforcement did not raise their voices, yell, threaten, intimidate, or otherwise use violence to coerce Defendant into speaking.

Defendant argues the agents' tactics were "designed exclusively to obtain incriminating statements" from her by "repeatedly confront[ing] her with allegations of prior assaults on Mr. Gilpin as well as perceived discrepancies between [her] prior statements and statements from other witnesses"; telling her "she was their only suspect"; telling her "she will have to explain what happened to a jury" and that "the evidence leads them to the conclusion that she beat-up Mr. Gilpin and caused his death." (Filing No. 32 at p. 3). But, "[T]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect

for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," do not "render a confession involuntary . . . unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" *Brave Heart*, 397 F.3d at 1041 (quoting *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993)). Here, the officers explained why they wanted to speak with Defendant, they did not make her any promises, and they conducted the interview in a cordial tone. In reviewing the interviews, the undersigned magistrate judge finds these tactics did not cause Defendant's "will to be overborne."

Defendant's personal characteristics also do not support a finding her "will and capacity for self-determination" were overborne at any point during her interactions with law enforcement officers. *LeBrun*, 363 F.3d at 726 (calling this standard "very demanding"). Defendant is in her late 40s, appears to be of at least average intelligence, did not appear to be under the influence of any substances, appeared to understand the questions and conversation, was gainfully employed, and has had a number of run-ins with the law over the years beginning in 1997, including DUIs, disorderly conduct, and assault.[7] See *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) ("A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary.").

Under these facts, the undersigned magistrate judge finds Defendant voluntarily made statements to law enforcement during all three interviews, and thus will recommend her motion to suppress her statements be denied.

## II.     Seizure and Search of Defendant's cell phone

Defendant argues her consent to the seizure of her and Mr. Gilpin's shared cell phone during the first interview, and her subsequent consent to the search of the cell phone in the second interview, were both invalid. Defendant argues she did not voluntarily consent, but instead acquiesced to law enforcement authority. (TR. 3; Filing No. 32 at p. 4).

"The voluntariness of consent is assessed under the totality of the circumstances." *United States v. Thomas*, 97 F.4th 1139, 1142 (8th Cir. 2024) (citing *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)). Consent is voluntary if it was "the product of an essentially free and unconstrained choice" by its maker. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). When

---

[7] This information comes from the Pretrial Services Report (Filing No. 8) prepared and filed in this case on October 26, 2023. The Court can sua sponte take judicial notice of its own records and files, and facts which are part of its public records. See *United States v. Jackson*, 640 F.2d 614, 617 (8th Cir. 1981).

determining whether consent was voluntary, the court "consider[s] factors, including the individual's age, intelligence and education, whether she cooperates with police, her knowledge of the right to refuse consent, whether the police threatened or intimidated her, and whether consent occurred in a public or secluded area." *Thomas*, 97 F.4th at 1142 (citing *United States v. Bearden*, 780 F.3d 887, 895 (8th Cir. 2015)).  The court should also consider "whether the individual was intoxicated or under the influence of drugs, whether she relied on promises or misrepresentations made by the police, whether she was in custody or under arrest, and whether the individual objected to the search or stood silently while it occurred."  *Id.* at 1143 (citing *Chaidez*, 906 F.2d at 381).

After review, the undersigned magistrate judge finds the totality of the circumstances demonstrates Defendant both voluntarily consented to the seizure of her cell phone and to its subsequent search.  The significance of the cell phone was first brought up by Defendant herself early in her first interview on March 13, 2022.  Defendant told Agent Feekes she did not know "if [Mr. Gilpin] left or what he did," but she saw on her phone that he had called a friend "at like 8:02, 8:30. Both of them were missed."  (Ex. 101 at p. 20).  Defendant then explained that she and Mr. Gilpin shared a cell phone and Mr. Gilpin did not have his own phone.  Defendant indicated she had the phone with her.  After a brief discussion about whether Defendant noticed any other calls on the phone, Agent Feekes asked, "Can I see that [the phone]?" and briefly looked at the missed calls Defendant had mentioned.  Agent Feekes then said, "Here, I'll quick give it back to you. I'll just write down this number," and returned the phone to Defendant.  To the extent this constituted a search, Defendant clearly voluntarily consented to providing her phone to Agent Feekes for him to look at these missed calls, and he returned her phone to her possession after briefly taking down the phone number noted by Defendant.

Towards the end of this first interview, Agent Feekes told Defendant not to leave town because "we'll need to talk to you again," and stated, "we might need that phone." (Ex. 101 at pp. 41-43).  Agent Feekes did not demand Defendant's phone, coerce her into giving him the phone, or otherwise suggest she was required to give him her phone; Agent Feekes' statement was simply conveying that in the future they "might" need to look at the phone for evidence.  Agent Feekes also informed Defendant that law enforcement has "tools" to find evidence on a phone if anything gets erased—a statement that further suggested Defendant was going to be permitted to keep her phone, but was being cautioned against deleting anything.  Agent Feekes then moved on from the

phone conversation and began wrapping up the interview, stating that once he gets the autopsy results back "we'll be in touch again." (Ex. 101 at p. 46).

It was Defendant's mother, not Agent Feekes, that brought the conversation back to the cell phone, asking, "How long would you take the—take her phone?" Agent Feekes replied, "It depends. And we'll – we'll see if we need it, you know. But we might – I could ask for it now. I don't know if – you know, I mean, sometimes we just ask for consent to take it." (Ex. 101 at p. 51). Defendant stated the cell phone was her only phone, as she does not have a home phone. Agent Feekes replied, "So we'll cross that bridge when we need to because that can take a little while. We would just look at call records and anything like that to see if there's any evidence on there of him meeting with somebody. . . ." Nothing about this conversation suggests that Agent Feekes was ordering, demanding, intimidating, or trying to persuade or coerce Defendant into turning over the phone. Instead, Agent Feekes spoke conditionally and hypothetically about whether or how long they would need the phone, and recognized that because it was Defendant's only phone, "we'll cross that bridge when we need to" since the process to search it can take a while.

Agent Feekes continued to discuss taking the cell phone as a hypothetical, asking Defendant if there was another way to reach her "if we take that phone." After Defendant provided her mother's phone number where she could be reached, Agent Feekes asked, "Well, would you feel comfortable giving us that phone now?" Defendant replied, "mm-hmm, Okay, yeah, take it." (Ex. 101 at p. 53; TR. 39). Agent Feekes continued, "I don't want you to be without a phone forever, but we can try to look at it and see what we need to do," to which Defendant stated, "Okay." Agent Feekes asked, "If that's alright?" to which Defendant replied, "Yeah." (Ex. 101 at p. 53; TR. 39, 55-56). By this point, Agent Feekes had explained law enforcement would look at the phone's call records and service providers to see if Mr. Gilpin called anyone or if anyone called him, mentioned they would look at photographs on the phone, and told Defendant the process "can take a little while." Despite Defendant having that information, Agent Feekes testified he perceived Defendant was "happy" to give him her phone, and the audio recording of the interview generally supports that perception. (TR. 55-56).

Nothing about the above exchange indicated Defendant was misled, coerced, or otherwise intimidated into providing law enforcement with her cell phone such that she was merely "succumbing" to law enforcement authority. True, Agent Feekes did not explicitly tell Defendant

she was free to refuse to provide her phone at that time, but much of Agent Feekes' discussion suggested that Defendant had the option to provide her phone or not—using words such as "might," "if," "we'll see if we need it," and "we'll cross that bridge when we need to." Agent Feekes also asked Defendant if she would be "comfortable" giving them her phone now, a question that could invite Defendant to say "no." Instead, Defendant replied affirmatively, stating, "Okay, yeah, take it." When Agent Feekes followed up with, "If that's alright," Defendant again responded affirmatively. As discussed above, Defendant's individual characteristics—her age, intelligence, lack of intoxication, and experience with the legal system—all indicate voluntariness. The environment where her consent took place—in the comfort of her mother's home with her mother present, during a discussion held in conversational tones that lasted less than an hour, without any physical restraints or other hallmarks of formal custody—all also indicate voluntariness. Under the totality of the circumstances, Defendant's consent to the seizure of her phone was voluntary and valid.

Despite seizing the phone during the first interview on March 13, 2022, Agent Feekes testified the phone was not searched until a forensic examination took place on March 28, 2022. (TR. 44). The Government maintains it obtained Defendant's consent to search the phone during the first interview on March 13, 2022, and on March 17, 2022, in Defendant's second interview. (Filing No. 39 at pp. 4-6).

At the outset of the March 17 interview, Agent Feekes told Defendant he had additional "paperwork" related to the phone. Agent Feekes then presented Defendant with an FD-26, which is an FBI consent to search form, and an FD-597, which is a receipt for property form that he had completed for taking her phone. Agent Feekes testified he provided Defendant with an opportunity to review the paperwork. Specifically, Agent Feekes told Defendant, "This just saying, kind of what we talked about [at the prior interview]; your consent for us to look. So, it has a date and then your signature." (TR. 43, 75; Ex. 102 at pp. 5-6). Defendant then signed the consent to search form. (Ex. 3).

Defendant contends her consent on this date was invalid. Defendant accurately points out that she was never verbally advised that she had the "right to deny permission to search or otherwise limit the scope of a search of the phone." Nor does the audio recording of her interviews reflect that agents read Defendant the information on the forms about consent and her right to refuse consent. However, being informed of the right to refuse consent is only relevant to, not dispositive

of, whether Defendant gave voluntary consent. See *United States v. Flores*, 474 F.3d 1100, 1105 (8th Cir. 2007) ("The fact that [the defendant] was never informed of his right to withhold consent . . . [is] not determinative of the [consent-to-search] issue."). Moreover, the record does reflect that agents provided Defendant with an opportunity to read the consent to search form before signing it, and that Defendant even grabbed her glasses in order to read it. (Ex. 102 at pp. 3-4). The form that Defendant read and signed says, "I have been advised of my right to refuse consent." And again, as discussed further above, the surrounding circumstances and Defendant's personal characteristics both weigh in favor of voluntariness of this consent. Defendant provided her consent during a non-custodial interview at her mother's house; she was provided an opportunity to read and sign the consent form without inducement or pressure from law enforcement; her consent was obtained within the first few minutes of the 19-minute non-custodial interview; she was not restrained or formally arrested; she was not threatened, intimidated, coerced, promised anything, or misled; she was not intoxicated; she is a 40-something year old woman appearing to be of at least average intelligence; and she has previous interactions with law enforcement. Under these facts, the totality of the circumstances demonstrate Defendant's consent to search was also voluntary. See *Thomas*, 97 F.4th at 1142.

In sum, the undersigned magistrate judge finds the totality of the circumstances demonstrate Defendant's recorded statements to law enforcement were made voluntarily while she was not in custody, and that Defendant voluntarily consented to both the seizure and search of her and Mr. Gilpin's shared cell phone. As such, her motion to suppress should be denied. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Brian C. Buescher, United States District Court Judge, that Defendant's Motion to Suppress Statements and Evidence (Filing No. 31) be denied.

Dated this 15th day of October, 2024.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this

Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.